660 A.2d 1153

DR. WILLIAM B. YOUNG, PLAINTIFF–RESPONDENT,
v. SCHERING CORPORATION AND DR. EDWIN S.
BROKKEN, DEFENDANTS–APPELLANTS.

Argued February 27, 1995—Decided July 11, 1995.

*Jerrold J. Wohlgemuth* argued the cause for appellants (*Apruzzese, McDermott, Mastro & Murphy*, attorneys).

*Arnold S. Cohen* argued the cause for respondent (*Balk, Oxfeld, Mandell and Cohen*, attorneys).

The opinion of the Court was delivered by

COLEMAN, J.

This wrongful termination of employment case requires us to determine the scope of the waiver provision of the New Jersey Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–8. The Appellate Division held that the statutory waiver does not preclude an employee from pursuing common-law claims that are sufficiently distinct from a CEPA claim. 275 *N.J.Super.* 221, 645 *A.*2d 1238 (1994). The Appellate Division, however, affirmed the dismissal of the CEPA claim and the related common-law claims. We denied plaintiff's petition for certification. 139 *N.J.* 184, 652

*A.*2d 172 (1994). We granted defendant's cross-petition, *ibid.*, to determine whether the waiver provision in CEPA requires dismissal of *all* of plaintiff's common-law tort and contract claims. We hold that the scope of the CEPA waiver provision does not prevent an employee from proceeding with his or her common-law tort and contract claims that are sufficiently distinct from the CEPA claim.

I

In January 1981 Schering Corporation (Schering) hired plaintiff William B. Young, a veterinary doctor, as Manager of International Clinical Research and Technical Services in its Animal Health Division. Schering promoted Dr. Young to Director of that department in April 1984 and to Director of its Worldwide Clinical Research and Technical Services in November 1986. In January 1988 defendant Dr. Edwin S. Brokken became Dr. Young's immediate supervisor.

Soon thereafter, Dr. Young complained to Dr. Brokken that Schering had an "unrealistic priority" of funding by investing in research and development of Florfenicol, a veterinary drug. Dr. Young believed Florfenicol would not receive Food and Drug Administration approval because studies had substantiated that Chloramphenicol, an analogue of Florfenicol, is associated with idiosyncratic aplastic anemia [a peculiarly, individualized decrease in red-blood cells] in humans, thereby causing a worldwide ban on its use in food for animals. Dr. Young disagreed with Dr. Brokken's decision to concentrate research on Florfenicol rather than Netobimin and Flunixin because he believed research of Florfenicol violated Schering's policies and federal regulations. Dr. Young's employment was terminated in August 1988. The parties disagree over what caused the termination.

Dr. Young filed a complaint against Schering and Dr. Brokken on February 2, 1989. He alleged in Count I violations of CEPA and common-law claims of malicious interference with an advantageous business relationship, harassment, intentional infliction of emotional distress, unjust work evaluation, wrongful discharge,

and loss of present and future salary. In Count II, plaintiff alleged common-law wrongful discharge and denial of severance pay in violation of Schering's personnel policies. In Count III, plaintiff alleged defamation, slander and malicious interference with prospective employment opportunities. The relief plaintiff sought by the complaint was reinstatement to his former position, injunctive relief and monetary damages, among other things.

In October 1989 Schering and Dr. Brokken succeeded in dismissing all common-law claims alleged in Count I and the breach of implied employment contract claims alleged in Count II on the ground that the CEPA waiver provision, *N.J.S.A.* 34:19–8, precluded plaintiff from pursuing those claims. The court preserved the CEPA claim and the Count III claims of defamation, slander and malicious interference with prospective employment opportunities against Dr. Brokken individually for his alleged *ultra vires* conduct.

On March 27, 1990, the trial court dismissed the CEPA claims for failure to state a claim upon which relief could be granted. *R.* 4:6–2(e). That dismissal was without prejudice to filing an amended complaint. In dismissing the CEPA claim, the trial court in part reasoned:

> Even accepting as true and viewing in the light most favorable to Young, all allegations in his complaint and all reasonable inferences that can be drawn therefrom ... these averments do not set forth a cause of action under *N.J.S.A.* 34:19–3a [and] c(1) or c(3) of CEPA. What Young has "disclosed" to Brokken and Schering officials, is his own disagreement with the choice made by both Brokken and Schering, to research the marketability potential of Florfenicol as opposed to Flunixin and Netobimin. He does not allege that he, in his oral and written communications, confronted Brokken or senior colleagues, with a particular law, rule, or regulation that would be violated by the decision to pursue the Florfenicol research, nor does Schering's decision, which this court believes to be a company policy decision, violate public policy.
>
> [*Young, supra,* 275 *N.J.Super.* at 227, 645 *A.2d* 1238.]

Approximately twenty months after the Count I CEPA claim was dismissed, Dr. Young filed an amended complaint on February 10, 1992, alleging Schering and Dr. Brokken terminated him in retaliation for warning them that test results of Flunixin should be reported to the governmental agencies of the United States, the United Kingdom and Canada where Schering allegedly marketed

Flunixin. He alleged that Schering failed to report the test results to those countries and to respond to Dr. Young's warnings to research a safe dosage of Flunixin. On May 29, 1992, the trial court dismissed the amended complaint because the one-year statute of limitations had expired, *see N.J.S.A.* 34:19–5, and because the doctrine of laches had been violated. The court stated that "not only [is the amended complaint] a distinct claim from the one originally raised, but it is one which is almost entirely contradictory to the thrust of his first allegation." The judge found no reasonable basis for the delay in filing the amended complaint.

On July 25, 1994, the Appellate Division affirmed the dismissal of the amended complaint because it did not relate back to the original complaint. *Young, supra,* 275 *N.J.Super.* at 229, 645 *A.*2d 1238. It was an entirely new claim. *Id.* at 229–30, 645 *A.*2d 1238. The Appellate Division also affirmed the dismissal of the CEPA cause of action alleged in Count I because CEPA does not provide a remedy for the discharge of employees who simply disagree with the employer's lawful research decisions. *Id.* at 237, 645 *A.*2d 1238. The Appellate Division also concluded that dismissal of the common-law claims alleged in Count I was proper because they sought the same remedy that plaintiff sought in the CEPA claim. As such, they were deemed waived under CEPA's waiver provision, *N.J.S.A.* 34:19–8. *Id.* at 237–38, 645 *A.*2d 1238. However, the court determined that CEPA's waiver provision does not extend to the Count II and III claims of severance pay, defamation, slander or malicious interference with prospective employment opportunities. It deemed those issues collateral to Dr. Young's CEPA claim because they require different proofs and do not require proof of a retaliatory motive. *Id.* at 238–40, 645 *A.*2d 1238.

## II

### A

Schering and Dr. Brokken contend that the Appellate Division misconstrued CEPA's waiver provision and incorrectly preserved

Dr. Young's Count II contractual claim for severance pay and his Count III common-law tort claims under theories of defamation, slander and malicious interference with prospective employment opportunities. They argue that those claims depend on a showing that Dr. Young was terminated in retaliation for his opposition to their research-funding decisions; therefore, those claims are waived by the institution of a CEPA claim. They suggest that a contrary interpretation of the waiver provision would result in duplicative claims.

Dr. Young argues that the severance-pay claim is based on contractual obligations that are unrelated to the retaliation claim, and the Count III tort claims are based on Dr. Brokken's conduct *after* the dismissal. Dr. Young asserts that Dr. Brokken falsely told former colleagues and prospective employers that plaintiff was fired because of irregular expense reports. *See Erickson v. Marsh & McLennan Co., Inc.*, 117 *N.J.* 539, 562–66, 569 *A.*2d 793 (1990). He argues that the post-employment conduct is not part of the retaliatory discharge claim and thus not covered by the waiver provision.

## B

CEPA was enacted in 1986 to protect from retaliatory action employees who "blow the whistle" on organizations engaged in illegal or harmful activity. *Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 *N.J.* 405, 417–18, 650 *A.*2d 958 (1994). *N.J.S.A.* 34:19–3 defines the class of employee actions protected by CEPA, and it provides:

An employer shall not take any retaliatory actions against an employee because the employee does any of the following:

a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law;

b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer or another employer, with whom there is a business relationship; or

c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation promulgated pursuant to law;

(2) is fraudulent or criminal; or

(3) is incompatible with a clear mandate or public policy concerning the public health, safety or welfare or protection of the environment.

The waiver provision in CEPA that controls this case is located at *N.J.S.A.* 34:19-8 and provides:

Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

There is a dearth of legislative history and case law explaining CEPA. The scant history that is available was described in *Abbamont, supra,* 138 *N.J.* at 417–18, 650 *A.*2d 958:

That law protects "whistle blowers," "who, believing that the public interest overrides the interest of the organization he [or she] serves, publicly 'blows the whistle' if the organization is involved in corrupt, illegal, fraudulent, or harmful activity." Ralph Nader et al., *Whistleblowing: The Report of the Conference on Professional Responsibility* vii (Ralph Nader et al., eds., 1972). As the bill's sponsor stated, CEPA's enactment is "important to all New Jersey workers who are concerned about working in a safe environment with honest employers." Linda Lamendola, *Safeguards Enacted for "Whistleblowers",* The Star Ledger, Sept. [9], 1986, at 1. When signing the whistleblower law, Governor Kean explained CEPA's purpose:

It is most unfortunate—but nonetheless, true—that conscientious employees have been subjected to firing, demotion or suspension for calling attention to illegal activity on the part of his or her employer.

It is just as unfortunate that illegal activities have not been brought to light because of deep-seated fear on the part of an employee that his or her livelihood will be taken away without recourse.

[Office of the Governor, *News Release* at 1 (Sept. 8, 1986).]

## C

Defendants contend the waiver provision is unambiguous and should be accorded its plain meaning. *Kimmelman v. Henkels & McCoy, Inc.,* 108 *N.J.* 123, 128, 527 *A.*2d 1368 (1987); *Renz v. Penn Cent. Corp.,* 87 *N.J.* 437, 440, 435 *A.*2d 540 (1981); *Sheeran v. Nationwide Mut. Ins. Co., Inc.,* 80 *N.J.* 548, 556, 404 *A.*2d 625

(1979). Because we find the waiver provision is far from clear, we must rely on other rules of statutory interpretation. The Court has emphasized repeatedly that "[i]n the interpretation of a statute our overriding goal has consistently been to determine the Legislature's intent." *Roig v. Kelsey*, 135 *N.J.* 500, 515, 641 *A.*2d 248 (1994); *accord Lesniak v. Budzash*, 133 *N.J.* 1, 8, 626 *A.*2d 1073 (1993).

Several other canons of statutory construction also inform our decision. Where the Legislature's intent is remedial, a court should construe a statute liberally. *E.g., Brookins v. Murray*, 131 *N.J.* 141, 149, 619 *A.*2d 583 (1993); *Torres v. Trenton Times Newspaper*, 64 *N.J.* 458, 461, 317 *A.*2d 361 (1974). Statutes in derogation of the common law, however, are to be construed narrowly. *Oswin v. Shaw*, 129 *N.J.* 290, 310, 609 *A.*2d 415 (1992). Exceptions to a statutory scheme also should be construed narrowly. *Service Armament Co. v. Hyland*, 70 *N.J.* 550, 558–59, 362 *A.*2d 13 (1976); *Hovbilt, Inc. v. Township of Howell,*, 263 *N.J.Super.* 567, 570, 623 *A.*2d 770 (App.Div.1993), *aff'd*, 138 *N.J.* 598, 651 *A.*2d 77 (1994). Furthermore, a court should avoid a literal interpretation of individual statutory terms or provisions that would be inconsistent with the overall purpose of the statute. *E.g., Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 160, 406 *A.*2d 140 (1979); *Loboda v. Township of Clark*, 40 *N.J.* 424, 435, 193 *A.*2d 97 (1963); *Wene v. Meyner*, 13 *N.J.* 185, 197, 98 *A.*2d 573 (1953).

We find the doctrine of probable legislative intent a more reliable guide than the overly literal reading of the waiver provision urged by defendants. *See Amerada Hess Corp. v. Director, Div. of Taxation*, 107 *N.J.* 307, 322, 526 *A.*2d 1029 (1987), *aff'd*, 490 *U.S.* 66, 109 *S.Ct.* 1617, 104 *L.Ed.*2d 58 (1989). A literal reading of the statute should not be invoked because we are thoroughly convinced the Legislature did not intend to penalize former employees by forcing them to choose between a CEPA claim and other legitimate claims that are substantially, if not totally, independent of the retaliatory discharge claim. *See State v. Haliski*,

140 *N.J.* 1, 16, 656 *A.*2d 1246 (1995); *State v. State Troopers Fraternal Ass'n,* 134 *N.J.* 393, 417–18, 634 *A.*2d 478 (1993).

One purpose of CEPA is to make it easier, not harder, for a former employee to prevail on a retaliatory discharge .claim by allowing the employee to report the employer's illegal conduct to a supervisor or public body. The Legislature obviously intended to provide a comprehensive and effective cause of action for retaliatory discharge. The passage of such remedial protection would be weakened or compromised if it would foreclose a legitimate cause of action arising from the same underlying factual circumstances but, nonetheless, not include or involve the retaliatory conduct that is essential to the CEPA claim. It would be paradoxical to interpret the waiver provision literally to hold that although the employee has claims independent of a time-barred CEPA claim, the mere filing of the CEPA claim requires dismissal of all other claims. We reject defendant's literal reading of the waiver provision because, as Judge Learned Hand said, "[t]here is no surer way to misread any document than to read it literally." *Guiseppi v. Walling,* 144 *F.*2d 608, 624 (2d Cir.1944), *aff'd sub nom., Gemsco, Inc. v. Walling,* 324 *U.S.* 244, 65 *S.Ct.* 605, 89 *L.Ed.* 921 (1945).

Furthermore, CEPA is remedial legislation and should be viewed "as a reaffirmation of this state's repugnance to an employer's retaliation against an employee who has done nothing more than assert statutory rights and protections and a recognition by the Legislature of a preexisting common-law tort cause of action for such retaliatory discharge." *LePore v. National Tool & Mfg. Co.,* 115 *N.J.* 226, 228, 557 *A.*2d 1371 (quoting *Lepore v. National Tool & Mfg. Co.,* 224 *N.J.Super.* 463, 470, 540 *A.*2d 1296 (App.Div. 1988)), *cert. denied,* 493 *U.S.* 954, 110 *.S.Ct.* 366, 107 *L.Ed.*2d 353 (1989).

CEPA also constitutes a partial codification of the prior common-law prohibition against the retaliatory discharge of at-will employees, principally articulated in *Pierce v. Ortho Pharmaceutical Corp.,* 84 *N.J.* 58, 417 *A.*2d 505 (1980), and implemented in

subsequent cases. *See Maher v. New Jersey Transit Rail Operations*, 125 *N.J.* 455, 472, 593 *A.*2d 750 (1991); *Young, supra,* 275 *N.J.Super.* at 234, 645 *A.*2d 1238; *Parker v. M & T Chemicals, Inc.,* 236 *N.J.Super.* 451, 457, 566 *A.*2d 215 (App.Div.1989). In addition, the common-law cause of action for retaliatory discharge of an employee covered by a collective-bargaining agreement, *Lepore, supra,* 224 *N.J.Super.* at 472–73, 540 *A.*2d 1296, has been codified by CEPA by broadly defining "employee" to include union and nonunion employees alike. *N.J.S.A.* 34:19–2(b). Thus, any statutory constriction of common-law remedies compels us to construe the waiver provision narrowly.

### III

#### A

Although the enactment of CEPA did not abolish the *Pierce* common-law cause of action, *Abbamont v. Piscataway Twp. Bd. of Educ.,* 238 *N.J.Super.* 603, 605, 570 *A.*2d 479 (App.Div.1990), *aff'd,* 138 *N.J.* 405, 650 *A.*2d 958 (1994), we are persuaded that the Legislature intended that the *N.J.S.A.* 34:19–8 waiver prevent an employee from pursuing both statutory and common-law retaliatory discharge causes of action. It thus sought to curtail essentially cumulative remedial actions. The CEPA cause of action benefits the employee because notification or threatened notification to a public body or a supervisor of illegal employer conduct is sufficient. *N.J.S.A.* 34:19–3, subd. a. Under *Pierce,* however, there must be actual notification to a governmental body of illegal employer conduct. Because CEPA defines the cause of action and concomitantly requires the waiver of *Pierce* and *LePore*-type claims, it indirectly inhibits the expansion of the common-law cause of action and, in that limited sense, is in derogation of the common law. *See Shaner v. Horizon Bancorp.,* 116 *N.J.* 433, 454, 561 *A.*2d 1130 (1989).

The internal structure of the waiver provision also supports its narrow application. It states clearly, at the beginning, that nothing in CEPA shall affect the legal rights, privileges and remedies

of an employee. *N.J.S.A.* 34:19–8. It then creates an exception to the protected rights, privileges and remedies, that CEPA does not affect. The exception provides that "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." *N.J.S.A.* 34:19–8.

The Legislature was undoubtedly aware of the Court's holdings in *Pierce* as well as the Court's invitation to the Legislature to address the problem of retaliatory discharge of employees. *Pierce* held that an at-will employee who has been terminated in retaliation for doing or refusing to do an act protected by "a clear mandate of public policy" has a common-law cause of action against the employer that sounds in contract, tort or both. *Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505. The sources of the public policy *Pierce* recognized "include legislation; administrative rules, regulations or decisions; and judicial decisions" as well as a professional code of ethics in certain instances. *Ibid.* In defining the *Pierce* cause of action, the Court sent a strong message to the legislative and executive branches of government by stating: "Absent legislation, the judiciary must define the cause of action in case-by-case determinations." *Ibid.*

Again in *Lally v. Copygraphics,* 85 *N.J.* 668, 670–71, 428 *A.*2d 1317 (1981), the Court suggested the need for legislative intervention in the area of retaliatory discharge of employees. There the Court held that despite the existence of a statutorily created administrative remedy for terminating an employee for filing a workers' compensation claim, *see N.J.S.A.* 34:15–39.1 to –39.2, a judicial cause of action was not foreclosed. The Court invited legislative consideration of retaliatory-discharge claims by stating: "If the Legislature had wanted to foreclose a judicial cause of action, it would have done so expressly." *Lally, supra,* 85 *N.J.* at 671, 428 *A.*2d 1317.

We believe the Legislature intended for the waiver to mean that a former employee forfeits his or her common-law retaliatory-

discharge cause of action when he or she "institutes" a CEPA cause of action. The Legislature recognized, by the language it used in the waiver exception, as did this Court in *Pierce,* that the sources of law where a mandate of public policy may be found are expansive. The *Pierce* cause of action is based on contract or tort common-law principles or both. As an exception to the general remedial scheme of CEPA, the waiver provision must be construed narrowly.

■■ We hold that the waiver exception means, for purposes of this case, that once a CEPA claim is "instituted," any rights or claims for retaliatory discharge based on a contract of employment; collective bargaining agreement; State law, whether its origin is the Legislature, the courts, the common law or rules of court; or regulations or ·decisions based on statutory authority, are all waived. The waiver exception contains a list of sources of law that may provide a bundle of rights protecting employees from retaliatory discharge. Parallel claims based on those rights, privileges and remedies are waived because they represent multiple or duplicative claims based on retaliatory discharge.

■ Construing CEPA's waiver clause consistent with the Legislature's inferred intent, and consistent with the expressed remedial purpose of the entire CEPA statute, convinces us that the waiver provision applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA. The waiver exception does not apply to those causes of action that are substantially independent of the CEPA claim.

*B*

Furthermore, our interpretation of the waiver exception is consistent with the holdings of other courts that the Appellate Division also found persuasive. *Casper v. Paine Webber Group, Inc.,* 787 *F.Supp.* 1480, 1509 (D.N.J.1992), and *Flaherty v. The Enclave,* 255 *N.J.Super.* 407, 413–14, 605 *A.*2d 301 (Law Div.1992), are examples.

In *Flaherty,* the plaintiff sued after his position as security director for the defendant condominium association was terminated. *Flaherty, supra,* 255 *N.J.Super.* at 410, 605 *A.*2d 301. Plaintiff's complaint alleged that he was terminated wrongfully after exposing an association board member's "wrongdoing." *Id.* at 413, 605 *A.*2d 301. In addition to a CEPA claim, the plaintiff included various common-law claims.

The court surmised that CEPA "was adopted to prohibit retaliatory action by an employer against an employee who discloses illegal activities on the part of the employer." *Id.* at 411, 605 *A.*2d 301. Noting that laws should be construed in accordance with legislative intent, it concluded that

[a] logical reading of CEPA would ... be that the "rights and remedies" referred to in the [waiver clause] relate specifically to the rights and remedies available if an employee is wrongfully discharged as a result of his or her disclosure activities. It should not be read, however, to mean all rights and remedies which arise out of the employment relationship between plaintiff and defendant.

[*Id.* at 412, 605 *A* 2d 301.]

The court concluded that plaintiff's claim for pre-termination compensation was not waived because it would be "illogical to assume that the Legislature intended plaintiff to waive his rights for compensation independent of proving a cause of action under CEPA." *Id.* at 413, 605 *A.*2d 301. In addition, the court found that plaintiff's wife's *per quod* defamation claim was not waived because she could not file a CEPA claim. *Id.* at 414, 605 *A.*2d 301.

Similarly, the United States District Court for the District of New Jersey determined in *Casper, supra,* that only those claims directly alleging retaliatory discharge were waived by plaintiff's decision to file a CEPA claim. 787 *F.Supp.* at 1509–10. There the court found the plaintiff's claim under the Equal Pay Act (EPA), 29 *U.S.C.A.* § 206, and the New Jersey Law Against Discrimination (NJLAD), *N.J.S.A.* 10:5–1 to –42, were not waived by alleging a violation of CEPA because retaliatory discharge was not an element of proof required to support those claims. The plaintiff based her NJLAD and EPA claims on gender bias, contending she was paid less than her male co-workers. Her

CEPA claim, however, was based on a memorandum that implied she would blow the whistle on the employer's actions. *Ibid.* Accord *Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476, 493, 638 *A.*2d 1341 (App.Div.), *certif. denied,* 136 *N.J.* 298, 642 *A.*2d 1006 (1994).

Significantly, the waiver provision in CEPA is virtually identical to the waiver provision in New York's Whistleblower Law, enacted in 1984. N.Y. Labor Law § 740, subd. 7 (McKinney 1988). The only case construing New York's waiver provision is *Kraus v. Brandstetter,* 185 *A.D.*2d 302, 586 *N.Y.S.*2d 269, 270 (1992). The court concluded that the "waiver only applies to those causes of action relating to retaliatory discharge. In this case, plaintiffs set forth causes of action sounding in tort which are separate and independent from the cause of action to recover damages for retaliatory termination of employment." *Id.*

## IV

■ We agree with the Appellate Division that plaintiff's claim for severance pay allegedly due and owing him under Schering's personnel policies pleaded in Count II and his common-law damages claims under theories of defamation, slander and malicious interference with prospective employment opportunities pleaded in Count III do not fall within the waiver provision. *Young, supra,* 275 *N.J.Super.* at 238, 645 *A.*2d 1238. Those claims are substantially unrelated to the retaliatory discharge claim as they "do not resemble the alleged CEPA violations and require different proofs than those needed to substantiate the CEPA claim." *Ibid.*

Plaintiff's severance pay claim is a contractual cause of action recognized in *Woolley v. Hoffmann–La Roche, Inc.,* 99 *N.J.* 284, 491 *A.*2d 1257, *modified,* 101 *N.J.* 10, 499 *A.*2d 515 (1985), and is independent of the retaliatory discharge claim.

■ We agree with the Appellate Division's factual analysis in determining why the Count III claims are not waived.

The claims of defamation, slander and malicious interference with prospective employment opportunities require different proofs than those required to sustain the CEPA claim and do not require a showing of retaliation as does a CEPA claim. Plaintiff will have to show the elements of defamation, slander and malicious interference by Dr. Brokken without regard to whether those actions were done in retaliation for plaintiff's disagreement with Schering's and Dr. Brokken's research decisions. Even if plaintiff can establish that Dr. Brokken defamed and slandered him, or that Dr. Brokken interfered with his prospective employment opportunities, such conduct will not constitute a violation of CEPA.

Additionally, Dr. Brokken's claimed interference with plaintiff's business opportunities cannot be considered a retaliatory action under CEPA because the Act covers action taken only with respect to the employment relationship established between the employer and employee. The language "other adverse employment action taken against an employee *in the terms and conditions of employment*" in *N.J.S.A.* 34:19-2e (emphasis added) does not include actions which might affect an employment relationship, or potential employment relationship, between the employee and a third party.

[*Young, supra,* 275 *N.J.Super.* at 239–40, 645 *A.2d* 1238.]

## V

The waiver provision raises several complex questions as to the extent of its application and its interaction with other sources of law.

Although the waiver provision does not use language of estoppel, "institution of an action" may be susceptible of meaning something other than the filing of a complaint as contemplated by *Rule* 4:2–2. The meaning of "institution of an action" could conceivably contemplate an election of remedies with restrictions in which the election is not considered to have been made until discovery is complete or the time of a pretrial conference contemplated by *Rule* 4:25–1. Another question is whether the statutory waiver is applicable if the CEPA claim is withdrawn or otherwise concluded prior to judgment on the merits. Cases involving mixed motives for retaliatory discharge, such as racial, age and gender discrimination present additional problems. Still another area involves cases implicating federal laws, such as the Taft–Hartley Act, 29 *U.S.C.A.* §§ 173(d) and 185, and the Federal Arbitration Act, 9 *U.S.C.A.* §§ 1 to 15. *See Bleumer v. Parkway Ins. Co.,* 277 *N.J.Super.* 378, 649 *A.*2d 913 (Law Div.1994); *see also Maher,*

*supra,* 125 *N.J.* at 472–75, 593 *A.*2d 750 (holding that CEPA claim was not preempted by the Railway Labor Act). Those and other significant questions are not decided in this case. Plaintiff's petition for certification sought to review some of those issues, but it was denied. For present purposes, we determine only that the Legislature did not intend the waiver provision to apply to causes of action that are substantially independent of the CEPA cause of action.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, STEIN and COLEMAN—6.

*Opposed*—None.