722 A.2d 967 (1999)
318 N.J. Super. 15
Albert DELANEY, Plaintiff-Appellant,
v.
GARDEN STATE AUTO PARK, a New Jersey Corporation, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted January 13, 1999.
Decided February 2, 1999.
*968 Ronald L. Lueddeke, Spring Lake, for plaintiff-appellant.
Ciarrocca & Ciarrocca, Union, for defendant-respondent (Mark P. Ciarrocca, on the brief).
Before Judges KING, NEWMAN and FALL.
The opinion of the court was delivered by NEWMAN, J.A.D.
In this Consumer Fraud Act case, plaintiff Albert Delaney, an automotive consumer, brought suit against defendant Garden State Auto Park, an automobile dealership, seeking damages for consumer fraud, breach of contract and negligence relating to the purchase of a used automobile. At issue is whether an automobile dealer's failure to disclose the price charged to the consumer for pre-delivery services and failure to itemize such services violates the Consumer Fraud Act, N.J.S.A. 56:8-1. We hold that defendant violated the Consumer Fraud Act in failing to disclose to the consumer the price of the pre-delivery services and in failing to itemize such services in the final sales agreement.

I.
Plaintiff responded to a newspaper advertisement in the Asbury Park Press for a 1988 Ford Crown Victoria at defendant's advertised price of $5995. On October 18, 1993, plaintiff met with Donna Mattos, a salesperson with defendant. He entered into a retail buyer's order for a sale price of $5783. Leaving a deposit of $75, he sought to finance part of the purchase in order to establish credit because he had not done so for many years.
Plaintiff received a call from the dealership informing him that there was a problem with the credit submission. He, therefore, returned on October 26, 1993, depositing an additional $3425, $3000 of which was paid in cash. Plaintiff was then referred to a financial officer, Joseph DeGeorge, Jr. DeGeorge sought to sell plaintiff a vehicle service contract for $1100. The standard warranty on the used car plaintiff was purchasing for the engine and powertrain was thirty days or 1,000 miles. The service contract extended the warranty to two years or 24,000 miles. In connection with this warranty, plaintiff signed an internal authorization form which listed the following items to be completed: rust proofing, undercoating, paint sealant and fabric guard. Underneath those four items, the following appeared:
All this is included in payment with the payment with the powertrain warranty. $218.29 b.o. 36 months.
Plaintiff rejected the service contract, considering it too costly. The service contract was then marked "VOID."
Thereafter, a retail installment sales agreement was executed, although some dispute exists over whether plaintiff endorsed the agreement in blank. The retail sales agreement, containing an itemization of the amount financed, noted plaintiff's total cash purchase price of $7983. After the deduction of plaintiff's total cash deposit of $3500 and *969 added finance charges, plaintiff's monthly payment was reduced to $177 for a thirty-six month term once he rejected the service contract. The retail installment sales agreement did not include or enumerate any pricing or listing of any type of pre-delivery service.
John Schmelz, III, the owner and president of Garden State Auto Park, testified that the price of each pre-delivery service was not enumerated in any document provided to the consumer:
Q. Now, you were asked a question regarding the invoice, and the fact that these items don't appear separately on an invoice. Is that unusual?
A. No, it would never be reflected. This is an internal document. This document is not provided to the consumer; this is an internal accounting document, so that the office can then put this through our accounting system.
Q. And when it talks about accessories and other things that Counsel pointed out to you, what type of stuff would that be?
A. It's never provided on this document. This document never reflects anything like that. The vehicle was sold as a whole, and as I said, this particular document is used, prepared by the clerk who administers the sales file in getting it ready for the bank. And then it's provided to the account personnel so that they can account for the sale of this vehicle. It's not ever provided. The only other thing that would be shown on this internal document, other than what's shown, is if there's a trade-in, that would be reflected on this document so that also it could be accounted for and brought into inventory.
After plaintiff made all of the payments, he received a copy of the retail installment sales agreement, disclosing that he had paid $7983 for the vehicle, an amount $2200 more than the $5783 he had agreed to pay pursuant to the retail buyer's order. Upon contacting defendant, plaintiff learned that the $2200 discrepancy represented the cost for rust proofing, undercoating, paint sealer and fabric guard.
Schmelz testified concerning the dealership costs associated with such services. He indicated that the dealership had a working relationship with Final Detail, Inc. and paid a flat fee of $85 per vehicle to do all vehicle cleanings and cosmetic detailing, including cleaning the motor area, interior shampooing of carpets and cleaning the exterior. Rust proofing, undercoating, paint sealer and fabric guard were also included items of work under the arrangement with Final Detail for this same price of $85.
Defendant's records show a $2732 profit on this sale. Defendant acknowledged that the service contract was void. Schmelz had no knowledge of whether there were any discussions concerning the items for which plaintiff was charged $2200. He did indicate that the internal authorization form showed those items were authorized. He also testified the company's policy was to make sure that retail installment sales agreements were filled out before they were signed by customers and that he would fire anyone who would not adhere to that policy. He did acknowledge that the items for which defendant was charged $2200 were not enumerated in the retail sales agreement, nor was the pricing for those items contained in any document. He assumed that the matter was discussed with the financial representative, Joe DeGeorge, Jr. Significantly, however, DeGeorge was not called as a witness.
The trial judge entered a judgment of no cause for action on plaintiff's complaint, finding that plaintiff did not sign the retail installment agreement in blank and that he knowingly entered into the retail installment agreement. He further concluded that plaintiff did not meet his burden of proving that the price of the service items was unconscionable. Even though there was an enormous discrepancy between what it cost the dealership for those items and what it charged its customers, plaintiff presented no evidence of the reasonable value of these services. Accordingly, the trial judge entered a verdict for defendant.
On appeal, plaintiff contends that the trial judge erred in not finding a consumer fraud violation regarding the service items and that he should have concluded, as a matter of law, *970 that the price charged to plaintiff for those service items was unconscionable.

II.
The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -48, focuses on commercial deception. It declares as unlawful
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission, of any material fact ... in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby....

[N.J.S.A. 56:8-2].
The Consumer Fraud Act ("Act") was passed in response to widespread complaints about selling practices that victimize consumers. It was designed to prevent deception, fraud or falsity, whether by acts of commission or omission, in connection with the sale and advertisement of merchandise and real estate. Barry v. Arrow Pontiac Inc., 100 N.J. 57, 69, 494 A.2d 804 (1985). The Act has been liberally construed as remedial legislation in favor of protecting consumers. Fenwick v. Kay Am. Jeep, Inc., 72 N.J. 372, 376-77, 371 A.2d 13 (1977).
In response to observed abuses in automotive sales practices where consumers were frequently induced to expend additional monies for services that were either unnecessary or not being performed, the Act was broadened, through implementing regulations, to further protect the automotive consumer. 27 N.J.R. 3568 (Sept. 18, 1995) (recodifying 13:45A-6.2). N.J.A.C. 13:45A-26B.2 declares it unlawful under the Act for an automotive dealer to:
Accept[ ], charg[e], or obtain[] from a consumer monies, or any other thing of value, in exchange for the performance of any pre-delivery service without first itemizing the actual pre-delivery service which is being performed and setting forth in writing on the sales document the price for each specific pre-delivery service.

[N.J.A.C. 13:45A-26B.2(a)1(ii)].
"Pre-delivery service fee" means:
... any monies or other thing of value which an automotive dealer accepts from a consumer in exchange for the performance of pre-delivery services upon a motor vehicle, and includes, but is not limited to, items which are often described or labeled as dealer preparation, vehicle preparation, predelivery service, handling and delivery, or any other term of similar import.

[N.J.A.C. 13:45A-26B.1].
Rust proofing, undercoating, paint sealer and fabric guard, the items associated with the added $2200 cost, are services included in vehicle preparation prior to the delivery of an automobile. In response to interrogatories, defendant indicated that the exact date of the installation of these services was "unknown." Whether such services were actually performed is even questionable on this record.
We have no hesitancy in concluding that the circumstances presented here were designed to be eliminated by the consumer fraud legislation. The evidence showed that the service items were to be installed in connection with the powertrain warranty which was covered by the vehicle service contract. The service contract was rejected by plaintiff because he did not want to spend $1100 above the price he was paying for a used 1988 vehicle. He testified that he definitely would not have spent double that amount for the service items.
Moreover, there was no evidence presented of any pricing for these items. The items were not enumerated in the retail installment agreement as required by N.J.A.C. 13:45A-26B.2. Schmelz had no knowledge of this particular transaction and DeGeorge, the person who attempted to sell the service contract covering the extended warranty for the engine and powertrain, was not produced as a witness.
We cannot ignore the fact that there is no breakdown of the pricing for these items in any document. Plaintiff's testimony that these items were not discussed nor was the pricing for them ever mentioned is unrebutted *971 on this record. Plaintiff contends that these items may have been mentioned, but only in terms of "an icing on the cake," probably in the context of the service contract. It is clear that there is nothing to indicate that plaintiff agreed to pay for these items. The internal authorization listing these items is not signed by plaintiff and the reference to the powertrain warranty is omitted.
The trial judge, noting that plaintiff failed to present evidence of the reasonable value of the services, did not address plaintiff's claim that defendant violated the Act even though it was presented by plaintiff. On this record, as a matter of our original jurisdiction, R. 2:10-5, we can reach no other conclusion than that defendant engaged in an unconscionable business practice in violation of the Act. N.J.S.A. 56:8-2 and N.J.A.C. 13:45A-26B.2. The fact that the dealer has reaped an enormous profit in causing the consumer to pay for pre-delivery services explicitly rejected by the consumer and not disclosed in the final sales agreement colors the result vividly in this case and reinforces the purpose of the Act in protecting the consumer against abusive automotive sales practices.
The damages for this violation are readily ascertainable. The cost for the service items was $2200. The extra interest charged because these items were wrongfully included in the automobile's price, as plaintiff's counsel noted, was $531 and increased the sale's tax by an additional $132. When added together, the total is $2863, which when trebled equals $8589. N.J.S.A. 56:8-19. Because plaintiff is also entitled to an award of reasonable attorney's fees, filing fees and reasonable costs of suit, we remand so those amounts may be determined upon sufficient proofs including the reasonable attorney's fees for the prosecution of this appeal and a single judgment for the entire amount entered. Ibid.; R. 2:11-4 and R. 2:11-5.
In view of our determination, we find it unnecessary to determine if the amount so charged for the service items of $2200 was unconscionable even in the absence of any testimony as to the reasonable value of these services.
Reversed and remanded for further proceedings consistent with this opinion.