759 A.2d 887 (1999)
334 N.J. Super. 385
George F. MULFORD, III, Plaintiff,
v.
COMPUTER LEASING, INC., Kevin C. McCormick, Paul M. Raynault and James F. Ahern, Defendants.
Superior Court of New Jersey, Law Division, Bergen County.
Decided April 1, 1999.
*888 Steven Pontell, Fort Lee, for George Mulford, III.
Kevin Marino, Newark, for Kevin McCormick.
Robert T. Regan, Westwood, for Paul Raynault.
Matthew J. Kirnan, Verona, for Computer Leasing, Inc. and James F. Ahern.
MARTIN J. KOLE, J., temporarily assigned to Superior Court, Bergen County.
George F. Mulford, plaintiff, in his complaint, seeks to recover commissions allegedly owed him by defendants Computer Leasing, Inc. (CLI) and its shareholders, directors and officers, Kevin C. McCormick and Paul Raynault, as well as its director and officer, James F. Ahern. The commissions are for completed sales or leases of computer equipment.

Mulford's entitlement to commissions, and other compensation
Mulford became a full time salesman for CLI in 1984. He has been fully paid his commissions through the year 1992, except for $29,265 which remained due.
*889 In 1992, CLI designated unilaterally existing accounts as house accounts and reduced 20% thereof to 14%.
When Mulford learned of the changes, he angrily discussed them with Foley and Raynault. He was told to quit by Foley if he were dissatisfied. Instead, he obtained a job with G.E. in November, 1992. He advised Michael McCormick (Kevin's brother and an executive in CLI) about the job. Michael then informed him that Raynault and Kevin McCormick wanted to keep him; and to this end, Raynault agreed to an additional $5,000 monthly draw and a better sales plan for him. The salary had been $5,000 per month before then. The salary and draw were now $10,000. CLI paid Mulford his 1992 commission in full at an 18% rate.
In 1994, Mulford met with Raynault. Mulford testified that in his discussion with Raynault it was agreed that the 1994 and 1995 rate would be 20%. This is corroborated by other evidence, including the May 4 and 5, 1995, letters referring to 20% signed by both Raynault and McCormick, as officers of CLI, on behalf of CLI. Although CLI's claim is that this letter was written in connection with a so-called buy-out, there is no other credible evidence that this is so. And there is nothing in any documents to support that claim.
Ahern testified that, when he discussed the $455,000 May 5, 1995, letter with Mulford, soon after it was presented to him for payment, Mulford told him that the money was to go into an escrow account: that his attorney had found a loophole in the escrow agreement pursuant to which, after being deposited in that account, Mulford could immediately withdraw it and use it personally; and that if Raynault and McCormick were that stupid, that was their problem. I find that this conversation did not take place and is on its face incredible. Mulford denies the conversation; it is unreasonable, under all of the evidence, to expect that Mulford would advise Ahern, a director and officer of CLI and the brother-in-law of Kevin McCormick, that he intended to commit such a fraud on the company or on McCormick and Raynault. Further, Mulford's persistent requests of Ahern, over the next few months, for payment in accordance with the May 5, 1995, letter, including the use of wire transfers to his personal account, are not at all consistent with a claimed deposit in an escrow, rather than a personal, account. I find the event testified to by Ahern to be simply an attempt by him to assist his brother-in-law Kevin McCormick.
Ahern testified that Hanratty was present when this Mulford conversation took place and that Tanzola had stated to Ahern that Mulford told him that the money was going into escrow. Hanratty, who now works for Ahern, did not testify, nor did Tanzola. There was thus no corroboration of Ahern's testimony as to Mulford's alleged conversation with him. This lack of corroboration is most significant in determining Ahern's lack of credibility in this respect. See Delaney v. Garden State Auto Park 318 N.J.Super. 15, 19, 722 A.2d 967 (App.Div.1999).
It is of significance that neither of the May 1995, letters refers to a buy-out. It would have been simple for McCormick and Reynault to add to the letters that the money would not be paid to Mulford but would be used as part of a buy-outthat it would be paid to a party to the buy-out. Instead, the letters read that "this will serve as authorization for payment of $455,000 by [CLI] to George Mulford. This sum represents 20% of the cash profit earned for his 1995 year to date transactions and does not represent previously money owed." (emphasis supplied). The parol evidence rule, a rule of substantive law, plainly bars McCormick's or CLI's evidence to vary the May 1995 agreement in this essential respect. Filmlife, Inc. v. Mal "Z" Ena, Inc. 251 N.J.Super. 570, 575, 598 A.2d 1234 (App.Div.1991).
Indeed, both the testimony of Raynault and McCormick as to the letter, and the *890 commissions payable to Mulford, are so vague and unreliable as to be worth very little. Their testimony in this respect is confusing and, frankly, somewhat misleading. I remarked earlier in the trial that Raynault and Kevin McCormick seem to have run this substantial enterprise as a "mom and pop" store, so far as the commission agreements and other employee matters were concerned. They may have gone out of their way to confuse, and even perhaps, mislead the plaintiff with respect to the amount of such commissions and when they would be paid. The fact is that the corporation did not pay plaintiff substantial commissions, even though promised through Raynault and McCormick, the principals of CLI.
I am satisfied that neither McCormick nor Raynault had any intention of paying to Mulford the amount stated as due him in the May 5, 1995, letter when they signed it. Plaintiff Mulford was treated like a ping-pong ball by them. Each would claim that the other had to approve a commission rate or the payment of commissions; and each would blame the other for any inaction on matters as to the payment of commissions. Indeed, McCormick indicated to Raynault that the $455,000 payable to plaintiff under the May 1995 letter would not be paid to plaintiff but would, instead, be paid to McCormick as part of Raynault's alleged buy out.
But this gloss on the May letter was never communicated to plaintiff, who credibly testified that the $455,000, referred to in the May 5, 1995, letter represented one-half the amount due him from CLI for the period January to May 1995, and had nothing to do with the buy-out. The remaining money due himthe other one-halfwas to be used for the buy-out, to be represented by shares of CLI stock. Additionally, I find that the changes in the May 4, letter made by McCormick were made in order that other salesmen would not be apprized of the fact that an owed commission was being paid to Mulford. They would thus not be requesting payment of their own commissions that were due.
Undisclosed matters such as the foregoing cannot adversely affect or impugn the clear meaning of the May 5, 1995, letter providing for payment of $455,000 due Mulford and to Mulford. See Hagrish v. Olson, 254 N.J.Super. 133, 138, 603 A.2d 108 (App.Div.1992).
Logic and common sense dictate the conclusion that this $455,000 was not payable to anyone but Mulford and was not paid to him simply because there was no cash then available to pay it.
Mulford plainly relied on Raynault's promises as to his compensation for the years in question in continuing to be employed at CLI and producing sales for it during those years. CLI is clearly bound thereby. See Peck v. Imedia, Inc., 293 N.J.Super. 151, 165-68, 679 A.2d 745 (App.Div.1996).
The fact that Mulford was terminated from employment by CLI in February 1996, cannot alone adversely effect his right to commissions earned. Any company policy to the contrarythat would deprive him of the 1996 commissions simply by reason of his terminationis void as effecting a forfeiture. See Ellis v. Lionikis, 152 N.J.Super. 321, 377 A.2d 1208 (Ch. Div.1977), aff'd on other gds., 162 N.J.Super. 579, 394 A.2d 116 (App.Div.1978). See also Wasserman's, Inc. v. Township of Middletown, 137 N.J. 238, 253-58, 645 A.2d 100 (1994); Carteret Prop. v. Variety Donuts, Inc., 49 N.J. 116, 127, 228 A.2d 674 (1967); Barr & Sons, Inc. v. Cherry Hill Center, Inc., 90 N.J.Super. 358, 377, 217 A.2d 631 (App.Div.1966). Cf. Platinum Management Inc. v. Dahms 285 N.J.Super. 274, 313-14, 666 A.2d 1028 (Law Div.1995).
I compute the commissions, compensation or damages due Mulford from CLI to be $788,078. I have relied upon and accepted generally the computations submitted by plaintiff. I have marked into *891 evidence plaintiff's document as C-1 and defendant's as C-2

Personal Liability[*]
I have concluded that the New Jersey statute also applies to CLI, a New York corporation, doing business in New Jersey, where the employees, such as Mulford, are based in, and work out of New Jersey. They are also residents of this state. These circumstances, and the strong public and statutory policy of this state in favor of protecting payment of employees' duly earned compensation, dictate the application of New Jersey law as to this issue. New Jersey has the paramount interest in enforcing its law in this case. See Butkera v. Hudson River Sloop "Clearwater", Inc., 300 N.J.Super. 550, 553-54,, 693 A.2d 520 (App.Div.1997), O'Connor v. Busch Gardens, 255 N.J.Super. 545, 605 A.2d 773 (App.Div.1992).
The New Jersey statute imposes personal liability on the managing officers of a corporation by deeming them the employers of the employees of the corporation. N.J.S.A. 34:11-4.1. The act applies to "wages", which means the direct monetary compensation for services rendered by an employee where the amount is determined, among others, on a "commission basis". I conclude that the statute is intended to allow a private right of action (a civil action) for a violation thereof to the employee against the employer and its managing officers for wages not paid as provided therein. Cf. N.J.S.A. 34:11-4.7 providing for a civil action by an employee against an employer for wages, where an agreement is made to pay such compensation other than as provided in the act. Employees are the obvious special beneficiaries of the statute; and to allow the civil action will plainly further its purpose. The statute thus impliedly confers on employees a private right of action in court against employers (as defined in N.J.S.A. 34:11-4.1) to protect and enforce their rights thereunder, as a remedy in addition to the penal and administrative sanctions and administrative wage collection proceedings, provided by other sections thereof. See N.J.S.A. 34:11-4.10 and N.J.S.A. 34:11-58. See Parks v. Pep Boys, 282 N.J.Super. 1, 659 A.2d 471 (App.Div.1995).
It should be noted that the administrative proceeding to recover wages is limited to cases in which "the sum in controversy,..., does not exceed $10,000.00". N.J.S.A. 34:11-58. Indeed, in addition to the implied private right of action already discussed, there is an express provision authorizing an employee to institute "an action for his claim in any court of competent jurisdiction". N.J.S.A. 34:11-66.
It is true that the definition of "employer" in connection with the latter statute (see N.J.S.A. 34:11-57) does not include the language of N.J.S.A. 34:11-4.1 to the effect that "officers of a corporation and any agents having the management of such corporation shall be deemed to be employers of the employees of the corporation". It merely defines "employer" as any "corporation employing another for hire". N.J.S.A. 34:11-57. But this definition must be deemed to have been supplanted by the enactment of N.J.S.A. 34:11-4.1, which is later in time. That was enacted by L. 1965, c. 173, paragraph 1, and was amended by L. 1991, c. 205, paragraph 1, while the earlier statutory definition (N.J.S.A. 34:11-57) was enacted by L. 1934, c. 91, paragraph 1, and was amended in minor respects by L. 1964, c. 92, paragraph 1.
Such subsequently enacted statutory definition, which is plainly in conflict with an earlier statutory definition, supersedes *892 the latter, particularly where, as here, the later definition is intended to effect a remedial purpose of the statutory scheme. See Young v. Schering Corp., 141 N.J. 16, 25-27, 660 A.2d 1153 (1995); New Jersey Transit Corp. v. Borough of Somerville, 139 N.J. 582, 591, 661 A.2d 778 (1995); State v. Roberts, 21 N.J. 552, 555, 123 A.2d 1 (1956); Town of Montclair v. Stanoyevich, 6 N.J. 479, 494, 79 A.2d 288 (1951).
Raynault is Chairman of the Board, and McCormick is President, of CLI. Both are the sole shareholders of CLI. James Ahern, another defendant, is a director and secretarytreasurer of CLI.
Section 4.2 (N.J.S.A. 34:11-4.2) requires every employer to pay the full amount of wages due to his employees at least twice per month on regular pay days designated in advance by the employer, in lawful money of the United States or with checks on banks where arrangements are made for the cashing of such checks. An employer may establish regular pay days less frequently for executive or other special classifications of employees, provided the employee shall be paid in full at least once each calendar month, on a regularly established schedule.
The evidence in the present case established that payments of commissions to salesmen did not comply with the forgoing provision. Instead, commissions were payable either quarterly or soon after the end of a calendar year. Even if, for some reason, this practice did not violate N.J.S.A. 34:11-4.2, CLI and its principal officers having management authority of the corporation, violated N.J.S.A. 34:11-4.3 and 34:11-4.8, by failing to pay Mulford commissions plainly due to him before he was fired, and any in an event, soon after he was fired in February, 1996.
N.J.S.A. 34:11-4.3 provides that, when an employee is laid off, the employer must pay the employee all wages due not later than the regular pay day for the pay period during which the employee's termination took place. It contemplates that when employees are compensated by any incentive system, "a reasonable approximation of all wages due" shall be paid until the exact amounts due can be computed. Assuming the same provision as to an incentive system applies to the computation of commissions, it is clear that CLI should have paid, and its managing officers should caused the corporation to have paid, Mulford at least $455,000 immediately after his being fired in February 1996. That was the minimal amount due agreed upon in May 1995. It is also an agreed upon amount that, as herebefore indicated, McCormick and Raynault never intended to pay to Mulford even when the agreement was made. This may constitute a species of fraud. See Van Dam Egg Co. v. Allendale Farms, Inc., 199 N.J.Super. 452, 457, 489 A.2d 1209, (App.Div.1985).
Additionally, under N.J.S.A. 34:11-4.8, Mulford should have been paid even before being fired in 1996i.e. soon after May 4 or 5, 1995. That section provides that, if there is a dispute as to the amount of wages, the employer should pay, without condition and within the time set forth by the act, all wages, or parts thereof, conceded by it to be due, leaving to the employee all remedies to which he might otherwise be entitled to, including those provided under the act, as to the balance claimed. It also provides that acceptance by an employee of a payment thereunder shall not constitute a release as to the balance of his claim, and any release required by an employer as a condition of payment shall be a violation of the act and be null and void. See Maldonado v. Lucca, 636 F.Supp. 621, 624 (D.N.J.1986) indicating the strong public policy in New Jersey in favor of payment of a compensation to employees, as evidenced by N.J.S.A. 34:11-4.8. See also, Feldman v. U.S. Sprint Com. Co., 714 F.Supp. 727, 731 (D.C.N.J.1989).
Ahern was a director and secretary-treasurer of CLI. He testified that, in effect, he had abandoned his duties as director, because his co-directors, Reynault *893 and McCormick, had advised him that he was not to function as such. Thus, he was not to be a tie-breaker in the event they could not agree on an issue. He apparently felt he was duty-bound to perform any of his functions, either as officer or director, only as directed or instructed by them.
As treasurer, he was in charge of the receipt and disbursement of funds by CLI, including the payment of salesmen's commissions. But he claimed that he could make a payment of commissions only as directed by McCormick and Reynault; and, even where such payment had been authorized in writing by them, he had to check with them to make sure it should be paid. This was the situation with respect to the May 5, 1995, order for payment of $455,000 due to Mulford. By such conduct he assisted in frustrating receipt of the agreed upon $455,000 by Mulford.
A director cannot abandon or abdicate his duties with impunity, especially as it relates to compensation to employees of the corporation, as required and regulated by statute. A director must discharge his duties in good faith and act as ordinarily prudent persons would under similar circumstances. He is an essential component of corporate governance. The New Jersey Business Corporation Act imposes a standard of ordinary care, skill and judgment on directors. Dummy, figurehead or accommodation directors are anachronisms with no place in New Jersey law. Thus, all directors are responsible for managing the business and affairs of the corporation. A director cannot protect himself from performance of his legally imposed duties behind a paper shield bearing the motto "dummy director". Directors may owe a duty to employees, as far as payment of their owed compensation is concerned. Francis v. United Jersey Bank, 87 N.J. 15, 30-31, 34-37, 432 A.2d 814 (1981). That case cited with approval Vujacich v. Southern Commercial, 21 Cal. App. 439, 132 P. 80 (Dist.Ct.App.1913), which held a director of a wholesale grocery business personally liable for conversion by the corporation of worker's funds deposited for safekeeping.
Thus, Ahern, as a director, was responsible, just as were Raynault and McCormick, for managing the business and affairs of the corporation. Even as an inactive director, and manifestly as an active officer (Secretary-Treasurer), Ahern is considered part of management of CLI. This is particularly so where, as here, the statutory regulatory scheme relating to employee compensation is involved. See O'Neal's Close Corporations (3d ed.) § 1.11, page 66.
McCormick, Raynault and Ahern are personally liable to Mulford, jointly and severally, for $455,000, plus prejudgment interest. The parties, by their conduct, essentially made that $455,000 a liquidated amount. Mulford is plainly entitled to prejudgment interest thereon.
The annual rates of prejudgment interest, under R. 4:42-11, are as follows (See Publisher's Note to the rule):

From May 5, 1995 to December 31, 19953.5%
 January 1, 1996 to December 31, 19965.5%
 January 1, 1997 to December 31, 19975.5%
 January 1, 1998 to December 31, 19985.5%
 January 1, 1999 and following5.5%

Interest for these periods is computed as follows:

May 1995 - December 31, 1995 $10,616
Jan 1996 - December 31, 1996 25,025
Jan 1997 - December 31, 1997 25,025
Jan 1998 - December 31, 1998 25,025
Jan 1999 - March 31, 1999 6,255
 _______
 $91,946

*894 The total awarded against McCormick, Raynault and Ahern, individually and jointly and severally, is $546,946. ($455,000 plus $91,946). Judgment will be entered against them for this amount, in favor of Mulford.
CLI is also liable to Mulford for this $546,946. Its liability is joint and several, with McCormick, Raynault and Ahern.
All of the defendants are further jointly and severally liable to Mulford for the $333,078 ($788,078 minus $455,000) balance of the $788,078 heretofore discussed, but without prejudgment interest thereon. No prejudgment interest will be awarded on this $333,078 for the following reasons: the amount of that balance, including various rates of commission, were hotly contested at trial by defendant. Additionally, I do not find sufficient equities in plaintiff's favor with respect to this amount to warrant allowance of such interest. See Manning Engineering Inc. v. Hudson County Park Comm'n, 71 N.J. 145, 159, 364 A.2d 1 (1976); Bak-A-Lum Corp. v. Alcoa Bldg. Products, 69 N.J. 123, 131, 351 A.2d 349 (1976).
Judgment will be entered in favor of plaintiff, against defendants CLI, McCormick, Raynault and Ahern, jointly and severally, for $880,024 ($546,946 plus $333,078).
However, I have concluded that the purpose and sense of the New Jersey statute will be furthered by deeming the liability of McCormick, Raynault and Ahern as secondary to that of CLI, so that their personal liability only comes into play to the extent CLI does not pay its judgment, Cf. Platinum Management Inc. v. Dahms, supra, 285 N.J.Super. 274, 314, 666 A.2d 1028 (Law Div.1995); N.Y. Bus, Corp.Law, sec. 630(a). Accordingly, the judgment against McCormick. Raynault and Ahern may be enforced only to the extent that CLI does not pay the judgment against it within the next 11 days, i.e., by April 12, 1999.
No costs to any party.

Counterclaim
The remaining issue on the counterclaim is whether Mulford, by reason of disloyalty or other wrongful act, is liable to CLI for damages arising out of its not being afforded or being deprived of the opportunity to finance an upgrade by ADP. Such disloyalty or wrongful act is also asserted as a defense to plaintiff's commission claim. [Discussion of counterclaim is omitted by the court.]
NOTES
[*] On April 30, 1998, by letter opinion I held that sec. 630 of the New York Corporation Law applies here. That statute places personal liability on shareholders of a corporation for employees' compensation. I also indicated that New Jersey statutory provisions may also apply. I cited the New Jersey Wage and Hour Law, N.J.S.A. 34:11-4.1 through -4.12. But actually that law also encompasses the wage collection provisions N.J.S.A. 34:11-57 through -67.