**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0352-19

ANNE K. BROWN,

     Plaintiff-Appellant,

v.

REGINA FOLEY, MERIDIAN
HEALTH SYSTEMS, INC.,
MERIDIAN HOSPITALS
CORPORATION, BAYSHORE
COMMUNITY HOSPITAL,
FRANK CITARA, KEVIN
DONOHOE, LINDA WALSH,
and DR. IAN B. LEBER, M.D.,

     Defendants-Respondents.

_____

        Argued February 9, 2021 – Decided May 20, 2021

        Before Judges Haas and Natali.

        On appeal from the Superior Court of New Jersey, Law
        Division, Middlesex County, Docket No. L-7442-16.

        Robert C. Brown argued the cause for appellant.

Wendy Johnson Lario argued the cause for respondents (Greenberg Traurig, LLP, attorneys; Wendy Johnson Lario on the brief).

PER CURIAM

Plaintiff Anne K. Brown appeals from a Law Division order granting summary judgment to defendants Meridian Hospitals Corporation (Meridian), Bayshore Community Hospital (Bayshore), and several of its executives, and denying her cross-motion for partial summary judgment. The court's order dismissed plaintiff's complaint in which she asserted claims under New Jersey's Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, and other common law causes of action.

On appeal, plaintiff claims that the court's decision to dismiss her CEPA claim was both procedurally improper and substantively erroneous, as the motion record contained genuine and material factual questions warranting a jury trial. Second, she contends that the trial court incorrectly dismissed her common law wrongful termination claims and maintains that she is entitled to compensation that was due and owing to her when she was fired. For the reasons that follow, we affirm in part and reverse and remand in part.

## I.

We begin by summarizing the facts submitted by the parties on their summary judgment motions, viewed in a light most favorable to the non-moving party. Brill v. Guardian Life Ins., 142 N.J. 520, 540 (1995).

### A. Plaintiff's Employment and Meridian Policies and Guidelines

Plaintiff began her employment at Bayshore as a staff pharmacist in 2003. Bayshore merged with Meridian in 2010, the same year that plaintiff was promoted to pharmacy manager, a position she held until her termination in 2015.

Plaintiff worked at Bayshore, and then Meridian, without a written employment contract. On April 1, 2011, she signed an acknowledgement that she was an at-will employee. She also executed an employee code of conduct in March 2011, and again in February 2012. Among other provisions, the code of conduct explained that Meridian established a compliance line for employees to report any incident or suspected violations of Meridian's policies in the event an employee was not comfortable raising the issue with their direct supervisor or team leader.

One of the Meridian policies in effect during plaintiff's employment required her to report all medication variances, defined as "medication errors in

prescribing, transcribing/documenting, dispensing or administering that could result in inappropriate medication use, medication omission, and/or harm to the patient," via Meridiancarelink, the hospital's incident reporting system. Meridian also had in place a patient safety and disclosure policy which required employees to report patient safety events, including medication discrepancies and potential threats to patient safety. The policy provided that any reporting employee would not face discipline if they immediately reported such events. Exceptions to the no-discipline policy included instances where there were reasons to believe that a patient safety event involved criminal activity or intent.

Plaintiff was also provided with the Meridian Team Member Handbook (the handbook). The handbook referenced the code of conduct and stated that while employees should bring ethical or legal concerns to their team leader as a first option, employees could also utilize the compliance line.

The handbook also set forth Meridian's disciplinary process under a section titled Guidelines for Cooperation and Discipline. The first page of this section contained a disclaimer emphasizing that "[t]eam members who are in leadership positions . . . are employed at-will" and that "[n]othing in [the handbook] changes their at will employment status." The disclaimer further provided that "nothing in [the] [h]andbook constitute[d] a contract of

A-0352-19

employment, including but not limited to, the Guidelines for Cooperation and Discipline [and] the Guaranteed Fair Treatment Policy." Finally, it stressed that "either [the employee] or Meridian can terminate their employment at any time, for any or no reason and with or without notice."

The Guidelines for Cooperation and Discipline described two levels of potential infractions, their attendant disciplinary consequences, and review process. Level I infractions included the failure to perform duties to a satisfactory degree and the failure to follow Meridian policy. Meridian addressed Level I infractions in accordance with a progressive four-step disciplinary process that could result in termination after a fourth infraction.

Level II infractions included conduct that was seriously detrimental to patient care or hospital operations. Level II infractions resulted in suspension without pay, followed by a disciplinary review meeting, at which the panel would either uphold the suspension, reinstate the employee, or terminate the employee.

Further, if an employee was suspended or terminated for either level of infraction, he or she could request a review hearing under Meridian's Guaranteed Fair Treatment Policy. Notably, Meridian expressed that it "reserve[d] the right to modify or revoke [the Guaranteed Fair Treatment Policy] or its

5

implementation to a particular case in full or in part from time to time as it deem[ed] appropriate."

The Guaranteed Fair Treatment Policy included a four-step procedure. Step one required the employee to complete a guaranteed fair treatment form and submit it to their appropriate supervisor. Step two provided that if the matter had not been resolved, the employee was required to submit the form to their administrative representative. Thereafter, the matter would be "investigated, and a meeting [would] be scheduled within five . . . working days after receipt of the form." Within twenty-four hours of the meeting, the employee would receive a disposition regarding the matter.

If the matter was still not resolved and the employee qualified, step three permitted the employee to request a meeting with the peer board of review within thirty days of the decision. Finally, step four provided that if the employee was ineligible for the step three peer board of review or wanted to appeal a decision, they were permitted to submit an appeal to the Meridian appeal board. Step four noted that the Meridian appeal board's decision was "final and binding."

A-0352-19

B. <u>Automated Medication Reporting System</u>

In order to safely secure its medications, Bayshore installed an automated medication dispensary cabinet system. The purpose of the system was to prevent the misappropriation of controlled dangerous substances by maintaining an accurate accounting of all medications used at the hospital.

In January 2013, Bayshore's lease for its automated medication dispensary cabinet system was set to expire, and it planned a transition to a new system, named MedSelect. Plaintiff and Bayshore's previous Chief Operating Officer submitted a proposal to Meridian to maintain the existing cabinet brand, as they believed that the MedSelect product was inferior. Plaintiff's proposal was rejected because, according to plaintiff, Meridian's Corporate Director of Pharmacy informed her that network hospitals had no other option but to install the MedSelect system.

Bayshore began replacing the MedSelect cabinets in August 2013 and completed the installation in April 2015. According to plaintiff, within a week, the cabinets began exhibiting mechanical and software problems, which continued until the time she was terminated. Plaintiff testified that she repeatedly made complaints to various Meridian employees and executives about the malfunctions stating that the MedSelect cabinets were "an inferior

A-0352-19

product that was compromising patient safety as well as the security of . . . the controlled drugs."[1]

Plaintiff, however, testified that she never made any report or complaint about the MedSelect cabinets specifically to Bayshore's Chief Operating Officer Regina Foley[2] and was not aware if anyone informed Foley of her complaints. Further, plaintiff testified that her project management skills led to the successful installation of the MedSelect cabinets throughout Bayshore.

In a series of emails in November 2014, several individuals, including plaintiff, discussed issues related to the functionality of certain of the MedSelect cabinets, and their impact on patient safety. In a separate email exchange in July 2015, plaintiff detailed how cabinet drawers regularly malfunctioned in three areas in the hospital. The emails addressed the vendor's agreement to remove the malfunctioning drawers in the problem areas as a test, and if that resolved the patient safety issues, the vendor would replace all remaining drawers.

---

[1]  We note that plaintiff did not submit her deposition testimony in its entirety, nor did she place the transcript pages in sequential order.

[2]  Foley was Bayshore's Chief Operating Officer at the time of plaintiff's termination.

A-0352-19

C.  The December 2015 incident

On December 4, 2015, an anesthesiologist removed a vial of fentanyl[3] from a MedSelect cabinet for patient treatment.  Plaintiff testified that the anesthesiologist failed to properly secure the drawer and two minutes later, an unknown individual inappropriately removed three additional vials of fentanyl.  The record reflects that a pharmacist "noted" the discrepancy, but neither the pharmacist, nor the anesthesiologist, reported the incident as a possible criminal drug diversion incident.

On that date, plaintiff was away from the hospital at a business conference, and the pharmacy supervisor covered her duties.  When the supervisor learned of the missing fentanyl, she emailed the head of anesthesiology requesting that he look into the matter.  Plaintiff was copied on the email and stated she reviewed it, and "filed it" because it she considered the event "nothing . . . out of the ordinary."

When plaintiff returned to work on December 11, 2015, the pharmacy supervisor forwarded plaintiff an updated email thread indicating that the physician "in charge" received the information regarding the December 4, 2015 incident.  Plaintiff testified that she did not follow up with any of the employees

---

[3] Fentanyl is an analog for heroin, a controlled dangerous substance.

9

who were looking into the matter. She also did not report the missing drugs as a potential criminal drug diversion because she and her colleagues treated the matter "as a routine type of discrepancy," and because "[t]he pharmacy knew about it . . . [and] was doing [its] normal investigation."

Plaintiff explained that neither she nor her colleagues reported every medication error to the risk management department because "[eighty] percent of them are probably miscounts." She also stated that the previous Bayshore Chief Operating Officer told her not to over-report errors to avoid unnecessary Drug Enforcement Agency (DEA) audits.

Plaintiff then went on an out-of-state vacation and returned to work on December 21, 2015. The record does not reflect any efforts she undertook to report or investigate the December 4, 2015 incident as a narcotics diversion prior to her return to work. On December 18, 2015, Wendy Moore, the Risk Manager of Riverview Medical Center (Riverview) contacted Kevin Donohoe, Bayshore's Risk Manager, and asked him whether there was any diversion of fentanyl at Bayshore. Donohoe, who had not been informed of the December 4, 2015 incident, told Moore he was not aware of any such issue.

At some point thereafter, Moore notified plaintiff that fentanyl was missing from Riverview, and reported that she was aware of a similar issue that

A-0352-19

occurred at Bayshore. Plaintiff failed to report this new information to Foley, Donohoe, or the DEA. On December 23, 2015, the police contacted plaintiff and requested to meet with her. That same day, plaintiff met with a detective and provided him information regarding the December 4, 2015 incident. The police also contacted Donahoe that morning, who told them that he was not aware of any diversion issues at Bayshore.

Later that day, just prior to a regularly scheduled safety meeting, plaintiff finally mentioned to Donohoe that fentanyl was missing from the hospital. Plaintiff testified that Donohue "was annoyed" because he was never informed of the December 4, 2015 incident. After the safety meeting, Donohoe notified Foley of the December 4, 2015 incident and possible diversion.

That same day, plaintiff was called to a meeting with Foley, Donohoe, Frank Citara, Bayshore Hospital's Senior Manager, Linda Walsh, Vice President and Chief Nurse Executive, and Dr. Ian Leber, Vice President of Clinical Effectiveness. Plaintiff testified that she anticipated meeting with Foley and Donohoe for an informal conversation, but she was surprised to see that there was a "whole gang set up to interrogate" her. At the meeting, plaintiff stated that when Donohoe asked her why she failed to enter information about the

11

missing fentanyl into the Meridiancarelink system, she replied, "we don't do that on a regular basis," but that she would do so in the future.

The record contains an undated, unsigned statement from Donohoe, which states that he called plaintiff and told her to bring a "timeline of events" to the meeting. Plaintiff testified that this statement was "a lie," but acknowledged that individuals at the meeting quizzed her about the timeline pertaining to the December 4, 2015 incident.

The record also contains unsigned notes from Foley detailing the December 23, 2015, meeting. Those notes explain that plaintiff knew about the missing fentanyl since December 4, 2015, did not enter the medication discrepancy into Meridiancarelink, and failed to notify Donohoe or Citara about the missing drugs. The notes also state that plaintiff "verbally acknowledged that she understands that she needed to tell someone about the situation and needed to do a better job with the process of securing narcotics."

On December 24, 2015, plaintiff met with Foley and Citara. Foley informed plaintiff that her failure to exercise leadership regarding the missing fentanyl, or failure to notify the DEA, was "egregious," and terminated her for cause. A December 31, 2015, Meridian team member action form notes that plaintiff was fired on December 24, 2015, for "poor performance."

12

Plaintiff filed a twelve-count complaint in which she claimed that defendants: violated her rights under CEPA[4] (count one); engaged in wage, age, and gender discrimination (counts two and three); intentionally denied her the opportunity to participate in Meridian's master of business administration program (count four); breached the implied covenant of good faith and fair dealing (count five); wrongfully terminated her for refusing to violate "public policy imposed upon the plaintiff by both [f]ederal and [s]tate law" regarding the installation and use of the newly installed MedSelect cabinets (count six); wrongfully terminated her under defendants' "own terms, conditions, procedures, guidelines and policies of employment" (count seven); blacklisted plaintiff from future employment "as a hospital pharmacist in central New Jersey" (count eight); refused to pay her accumulated paid time off and extended sick leave in addition to a "Special Team Member Award" (count nine); engaged in age discrimination by refusing to rehire her (count ten); defamation (count

---

[4] In light of our Supreme Court's recent decision in Allen v. Cape May County, ___ N.J. ___, ___ (2021), we note that plaintiff's CEPA claim is brought under N.J.S.A. 34:19-3(c). In this regard, plaintiff testified that she was retaliated against for reporting her "reasonable belief that there were criminal violation[s] [and] statutory violations in the purchase of the MedSelect machines." N.J.S.A. 34:19-3(c) prohibits retaliatory conduct by an employer against an employee who "objects to . . . any activity, policy, or practice which the employee reasonably believes . . . is a violation of a law" or "fraudulent or criminal."

A-0352-19

eleven); and defendants' "violation of contractual certifications and assurances to continued federal funding" (count twelve).

On May 24, 2019, defendants filed a motion for summary judgment returnable on June 21, 2019, which was four days after the June 17, 2019 scheduled trial. After the parties failed to settle at the trial call, the court adjourned the matter to September 9, 2019, and rescheduled defendants' summary judgment motion for July 26, 2019.

Plaintiff opposed defendants' motion and cross-moved for partial summary judgment on counts six and seven of the complaint. On August 16, 2019, the court issued an oral decision granting defendants' summary judgment application and denying plaintiff's cross-motion.

In dismissing defendants' CEPA claim, the court applied the four-part test detailed in Hitesman v. Bridgeway, Inc., 218 N.J. 8 (2014),[5] and concluded plaintiff had satisfied elements one through three but failed to establish a causal link between her complaints and subsequent termination. Specifically, the court found that the record did not "bear out the theory espoused by the plaintiff that her ultimate termination was in fact, somehow causally linked" to her previous

---

[5] Our Supreme Court relied on the same test in its recent decision in Chiofalo v. State, 238 N.J. 527 (2019).

complaints about the MedSelect cabinets. The court also dismissed plaintiff's age, wage, and gender discrimination counts because the record did not demonstrate that defendants were motivated by discriminatory intent in terminating plaintiff, in hiring other individuals, or in, allegedly, declining to pay her equally compared to other employees.

Next, the court dismissed plaintiff's wrongful termination claims in counts six and seven on the basis that they were barred by the CEPA waiver statute, and because she was an at-will employee. Finally, the court dismissed plaintiff's claims in count nine as lacking support in the record. This appeal followed.

In her first and second points, plaintiff argues that the court erred in granting defendants' summary judgment motion because defendants' motion was procedurally and substantively deficient. Specifically, plaintiff claims that defendants failed to file their summary judgment motion in accordance with the procedures outlined in the New Jersey Court Rules. Plaintiff also contends summary judgment was improper because defendants failed to provide discovery in response to her properly propounded discovery requests.

Substantively, plaintiff argues that the motion record contained genuine and material factual questions warranting denial of defendants' application as to the causation element of her CEPA claim. In plaintiff's third point, she argues

15

that the court erred in dismissing her wrongful termination claims in counts six and seven, and her request for compensation for her accrued personal time off and extended sick leave and "Special Team Member Award" in count nine, because she was terminated in violation of Meridian's disciplinary guidelines outlined in the handbook. We are not persuaded by any of these arguments.[6]

## II.

Plaintiff asserts, for the first time on appeal, that defendants improperly filed their summary judgment motion twenty-four days before the trial date in violation of Rule 4:46-1, which requires parties to file such dispositive motions no later than thirty days prior to the scheduled trial date. As trial was scheduled for June 17, 2019, and defendants filed their application on May 24, 2019, plaintiff contends that the court should have rejected the untimely motion and allowed the case to proceed to trial.

---

[6] Plaintiff's merits brief does not challenge the court's dismissal of counts two, three, and four that addressed her wage, age, and gender discrimination claims. Further, plaintiff does not contest the dismissal of count five, and as noted by the trial court, conceded that her claim for the breach of the covenant of good faith and fair dealing was barred under the CEPA waiver statute, N.J.S.A. 34:19-8. The court dismissed counts eight, eleven, and twelve pursuant to a separate May 12, 2017 court order, which plaintiff has not appealed. We accordingly do not address the dismissal of these counts, and deem any challenge waived. Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008); Zavodnick v. Leven, 340 N.J. Super. 94, 103 (App. Div. 2001).

16

We initially note that plaintiff failed to raise this procedural objection before the trial court. Generally, we will not consider arguments not properly presented to a trial court, unless the issue raised relates to the jurisdiction of the trial court or concerns a matter of great public interest. Nieder v. Royal Indem. Ins., 62 N.J. 229, 234 (1973). Neither exception applies here. We nevertheless address the merits of plaintiff's argument for the sake of completeness.

Rule 4:46-1 provides that summary judgment motions must be returnable no later than thirty days before the scheduled trial date, "unless the court otherwise orders for good cause shown." The "'unless otherwise ordered' language contemplates scheduling by the court, prior to trial, either sua sponte or upon a showing of good cause by the movant." Seoung Ouk Cho v. Trinitas Reg'l Med. Ctr., 443 N.J. Super. 461, 471 (App. Div. 2015). Rule 4:46-1 does not establish time requirements "that must be met in every case for due process demands to be satisfied." Id. at 474.

We review trial court's scheduling decisions, including grants of adjournment requests for abuse of discretion. Kosmowski v. Atl. City Med. Ctr., 175 N.J. 568, 573-75 (2003). While the "abuse of discretion" standard defies exact definition, "it arises when a decision is made without a rational explanation, inexplicably departed from established principles, or rested on an

impermissible basis." Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002) (internal quotations omitted).

Here, as noted, defendants filed their summary judgment motion on May 24, 2019, less than thirty days prior to the then scheduled June 17, 2019 trial date. On June 17, 2019, however, the court adjourned the trial to September 9, 2019. This provided plaintiff with ample time to respond to the motion and if necessary, prepare for trial, thereby satisfying all due process considerations. We also note that in addition to opposing defendants' motion, plaintiff cross-moved for summary judgment on July 16, 2019.

Plaintiff next contends that the court erred in granting summary judgment because discovery was incomplete. She further alleges that defendants failed to produce requested discovery by improperly "screening and filtering" the documents and records she requested. Again, we disagree.

Summary judgment is inappropriate when discovery is incomplete and material facts are within the moving party's exclusive knowledge. Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 193 (1988). Parties opposing summary judgment on the grounds that additional discovery is required "must specify what further discovery is required, rather than simply asserting a generic

contention that discovery is incomplete." Trinity Church v. Lawson-Bell, 394 N.J. Super. 159, 166 (App. Div. 2007).

Further, a "motion for summary judgment is not premature merely because discovery has not been completed, unless plaintiff is able to 'demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action.'" Badiali v. N.J. Mfrs. Ins., 220 N.J. 544, 555 (2015) (quoting Wellington v. Est. of Wellington, 359 N.J. Super. 484, 496 (App. Div. 2003)).

Moreover, while the filing of a cross-motion for summary judgment does not automatically prevent the existence of fact issues or obviate the need for a trial on disputed issues of fact, In re Estate of DeFrank, 433 N.J. Super. 258, 265-66 (App. Div. 2013), "the filing of a cross-motion for summary judgment generally limits the ability of the losing party to argue that an issue raises questions of fact, because the act of filing the cross-motion represents to the court the ripeness of the party's right to prevail as a matter of law." Spring Creek Holding Co. v. Shinnihon U.S.A. Co., 399 N.J. Super. 158, 177 (App. Div. 2008). The fact that discovery is incomplete does not preclude the entry of summary judgment when the opposing party does not move to extend the discovery deadline or seek the intended discovery within the time permitted by

the Rules. Schettino v. Roizman Development, Inc., 310 N.J. Super. 159, 165 (App. Div. 1998).

First, we reject plaintiff's claims that defendants improperly withheld discovery, that their motion was premature, or unsupported by the record. Second, the court established the final discovery deadline as February 27, 2019. At no time between that date and the August 16, 2019, motion hearing did plaintiff seek court intervention to remedy any alleged discovery violations.

Third, during the approximately two years of discovery afforded plaintiff, she failed to depose any of the individual defendants or a Meridian or Bayshore corporate designee. Plaintiff also did not file a motion to reopen discovery or claim that summary judgment was premature because discovery was outstanding. To the contrary, plaintiff cross-moved for partial summary judgment. When asked by the court what efforts plaintiff made to compel discovery, plaintiff's counsel acknowledged he made no such application. On such a record, we are satisfied that the court did not abuse its discretion in scheduling and resolving the parties' summary judgment motions.

## III.

Plaintiff next maintains that the court erred in dismissing her CEPA claim. She asserts that the court misapplied applicable case law in concluding that she

failed to establish a causal link between her MedSelect cabinet complaints and her subsequent termination. Plaintiff argues that she was not required to establish a direct causal link, and claims that she met her burden because the record demonstrates that defendants took numerous retaliatory actions including: 1) denying her a promotion, equal pay, and the opportunity to participate in Meridian's MBA program; 2) terminating her contrary to their own disciplinary guidelines and without a hearing as permitted by the Guaranteed Fair Treatment Policy; 3) conspiring to find any legitimate reason to terminate her; 4) dismissing her concerns in 2010 regarding Meridian's decision to switch intravenous medication suppliers; and 5) refusing to rehire her.

Plaintiff also argues that defendants falsely represented to the court that Foley was unaware of plaintiff's complaints regarding the MedSelect cabinets. She maintains that the court relied upon these false statements and maintains that Foley, in fact, was aware of the complaints because she was copied on the July 2015 email chain regarding the malfunctioning MedSelect cabinets.

Plaintiff also contends that Foley was informed of her complaints during the safety meetings. Finally, plaintiff maintains, for the first time on appeal, that the court should have denied defendants' summary judgment motion because they failed to include a certification from a Bayshore or Meridian

A-0352-19

pharmacist or pharmacy manager corroborating defendants' claim that she violated Meridian's reporting policy.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Townsend v. Pierre, 221 N.J. 36, 59 (2015). Summary judgment must be granted if the court determines "that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill, 142 N.J. at 540. We accord no special deference to the trial judge's conclusions on issues of law. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

"CEPA defines 'retaliatory action' as the 'discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment.'" Beasley v. Passaic Cnty., 377 N.J. Super. 585, 606 (App. Div. 2005) (quoting N.J.S.A. 34:19-2(e)). "Retaliatory action under CEPA is confined to 'completed . . . personnel actions that have an effect on either compensation or job rank.'" Ibid. (quoting Borawski

v. Henderson, 265 F. Supp. 2d 475, 486 (D. N.J. 2003)).  "Filing a CEPA or other complaint against an employer also 'does not insulate [a] complaining employee from discharge or other disciplinary action for reasons unrelated to the complaint.'"  Ibid. (quoting Higgins v. Pascack Valley Hosp., 158 N.J. 404, 424 (1999)).

To establish a CEPA violation, a plaintiff must demonstrate that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c);
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [Chiofalo, 238 N.J. at 541.]

A plaintiff who brings a CEPA claim is not required to show that his or her employer's conduct was actually fraudulent or illegal.  Id. at 542 (citing Dzwonar v. McDevitt, 177 N.J. 451, 463 (2003)).  Rather, "[a] plaintiff is required only to 'set forth facts that would support an objectively reasonable belief that a violation has occurred.'"  Ibid. (quoting Dzwonar, 177 N.J. at 464).

A-0352-19

However, "as a threshold matter" the court "must 'first find and enunciate the specific terms of a statute or regulation, or the clear expression of public policy, which would be violated if the facts as alleged are true.'" Dzwonar, 177 N.J. at 463 (quoting Fineman v. N.J. Dep't of Human Servs., 272 N.J. Super. 606, 620 (App. Div. 1994) (emphasis omitted)). A mere disagreement with an employer's practice, policy, or activity is insufficient to defeat summary judgment. Young v. Schering Corp., 275 N.J. Super. 221, 236-37 (App. Div. 1995).

If a plaintiff establishes the statutory elements, the burden shifts back to the employer to "advance a legitimate, nondiscriminatory reason for the adverse" employment action. Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28, 39 (App. Div. 2005). "If such reasons are proffered, [the] plaintiff must then raise a genuine issue of material fact that the employer's proffered explanation is pretextual." Ibid.

As noted, to satisfy the fourth prong of the CEPA test, a plaintiff must demonstrate that "a causal connection exists between the whistle-blowing activity and the adverse employment action." Chiofalo, 238 N.J. at 541. In other words, a plaintiff must show a "factual nexus between their protected activity under CEPA and the alleged retaliatory conduct." Hancock v. Borough of Oaklyn, 347 N.J. Super. 350, 361 (App. Div. 2002). Further, "the mere fact

that [an] adverse employment action occurs after [the protected activity] will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two." Young v. Hobart W. Grp., 385 N.J. Super. 448, 467 (App. Div. 2005) (alterations in original) (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).

A causal connection "can be satisfied by inferences that the trier of fact may reasonably draw based on circumstances surrounding the employment action." Maimone v. City of Atl. City, 188 N.J. 221, 237 (2006). As plaintiff correctly notes, she need not show a "direct causal link" between the whistle-blowing activity and the retaliation. Battaglia v. United Parcel Serv. Inc., 214 N.J. 518, 558 (2013). Evidence of such circumstances may include "[t]he temporal proximity of employee conduct protected by CEPA and an adverse employment action," Maimone, 188 N.J. at 237, but temporal proximity, "standing alone, is insufficient to establish causation." Hancock, 347 N.J. Super. at 361. Temporal proximity, on its own, will only support an inference of causation when the facts "are so 'unusually suggestive of retaliatory motive.'" Young, 385 N.J. Super. at 467 (quoting Krouse, 126 F.3d at 503).

Even if we assume, as did the court, that plaintiff satisfied the first three CEPA elements, we agree that the motion record, and all reasonable inferences

25

to be discerned from it, failed to contain genuine and material factual questions regarding the fourth CEPA prong sufficient to warrant denial of defendants' motions.

We reject plaintiff's claims that defendants purported retaliatory conduct leading up to, and after her termination was causally related to her CEPA allegations. We are satisfied from our de novo review of the record that plaintiff's assertions, most of which relate to her dismissed and unchallenged wage, age, and gender discrimination claims, including that defendants: 1) denied her equal pay and a promotion and the opportunity to participate in Meridian's MBA program, 2) refused to rehire her, and 3) dismissed her complaints regarding inferior medical supplies, even if accepted as true, individually and collectively, do not raise factual disputes that her termination was causally related to any complaints she raised with respect to the MedSelect cabinet safety issues, nor do they create genuine and material factual questions that her firing was pretextual. At bottom, plaintiff's claims are a disparate series of complaints made over the course of five years unmoored directly or indirectly to any retaliatory action taken by defendants.

Further, we conclude that defendants' decision to terminate plaintiff without a hearing was not in contravention of Meridian's disciplinary guidelines,

or retaliatory. As we address at pp. 34-35, plaintiff was an at-will employee who could be terminated at any point, with or without cause.

Plaintiff admitted that the MedSelect cabinets experienced problems within a week of the installation in 2013, and that she made several complaints to various employees and executives. Plaintiff, however, testified that she was never disciplined, suspended, demoted, or had a reduction in pay. In fact, plaintiff lauded her project management skills for the successful installation of the MedSelect cabinets. Finally, at no point did any Meridian employee suggest patient safety involving securing medication was not to be taken seriously. Rather, Meridian's policies suggest the exact opposite conclusion.

With respect to Foley's knowledge of plaintiff's complaints related to the MedSelect cabinets, plaintiff testified at her deposition that she never made any report or complaint about the MedSelect cabinets to Foley, and she was not aware of whether anyone informed Foley of her complaints, despite her claim that she made numerous complaints to other employees. Further, plaintiff admitted at her deposition that Foley believed she failed to "exercise or demonstrate leadership in assessing and evaluating" the December 4, 2015, incident.

Finally, we note that plaintiff knew on December 22, 2015, at the latest, that the December 4, 2015, incident involved the diversion of fentanyl yet still failed to notify Foley, Donohoe, or the DEA.  Thus, even indulging plaintiff's argument that she established a prima facie CEPA claim, defendants proffered a legitimate basis for her termination.  That is, plaintiff was fired for independently failing to report the December 4, 2015, incident, either directly to her supervisor or via the Meridiancarelink as required by Meridian policy, and even after she knew it involved a drug diversion.

We also reject plaintiff's argument that the July 2015 email chain upon which Foley was copied established, directly or by reasonable inference, that she was retaliated against based on her concerns regarding the functionality of the MedSelect cabinets and any impact on patient safety.  As noted, those emails do not relate to the December 4, 2015 incident or to any specific patient safety complaint or concern, but to general issues regarding the proper function of the MedSelect cabinets and the vendor's compliance to replace certain cabinet drawers.

For example, on July 6, 2015, the sales representative for the vendor that provided the cabinets emailed plaintiff expressing his understanding that there was "no provision or contingency offer made to expand a no charge swap out"

A-0352-19

of all the drawers. That same day, plaintiff replied that her recollection was that the vendor would replace the SIA drawers "in the [three] worst locations" and if the problems were resolved "the remaining [drawers] would also be changed at no cost because we were sold the [i]nferior, unproven and unreliable SIA drawers which then created a significant patient safety issue." Plaintiff's responsive email expresses her understanding of the proposal that if patient safety problems were resolved after the drawers were replaced, the vendor would replace the remaining drawers at "no cost."

Simply put, no reasonable inference can be drawn that Foley retaliated against plaintiff approximately five months later based on an email chain regarding general vendor compliance issues. In addition, the record lacks any support for plaintiff's claim that Foley had knowledge of the complaints from the daily safety meetings, or that she took any retaliatory employment action based on any statements at those meetings. As plaintiff concedes, the documents detailing those meetings are not included in the record.

Finally, we disagree with plaintiff's contention that defendants failed to refute her assertion that she did not violate any Meridian reporting policy. Specifically, plaintiff maintains that without a certification from a Bayshore

29

pharmacy professional corroborating this policy, the trial court was required to deny defendants' motion.

As with many of the arguments plaintiff raises on appeal, plaintiff also did not raise this argument in the trial court. We are nevertheless satisfied that defendants were not required to support their summary judgment application with a certification that plaintiff violated hospital policy. That policy was contained in the record in the patient safety and disclosure procedure. Finally, there is ample support in the record that plaintiff was an at-will employee who was fired because she did not "exercise or demonstrate leadership" in assessing and evaluating the fentanyl diversion incident by failing to report or adhere to appropriate Meridian's guidelines.

IV.

Plaintiff next contends that the trial court erred in dismissing her wrongful termination claims plead in counts six and seven. Specifically, plaintiff maintains that the court erred in finding that she was "legitimately terminated" because defendants failed to follow the stepped disciplinary procedures outlined in the Meridian disciplinary guidelines and did not provide her with a review hearing under the Guaranteed Fair Treatment Policy. Plaintiff also alleges that Foley submitted a false certification to the court, because her certification states

A-0352-19

that she was the only person authorized to terminate plaintiff, while Meridian's policy provides otherwise. In addition, plaintiff claims the court incorrectly dismissed count nine and maintains that she is entitled to compensation for her accrued personal time off and extended sick leave, and "Special Team Member Award."

We agree with the court that the plaintiff's claims in count six are within the scope of the CEPA waiver provision detailed in N.J.S.A. 34:19-8, but disagree that plaintiff's claims in count nine are barred by that provision. We also find that count seven was properly dismissed as plaintiff was an at-will employee who was not contractually guaranteed the stepped procedures outlined in the handbook.

To avoid the litigation of duplicative reprisal-related claims, CEPA provides that the "institution" of a CEPA lawsuit "shall be deemed a waiver of the rights and remedies available under any other . . . [s]tate law, rule or regulation or under the common law." N.J.S.A. 34:19-8. The waiver provision is to be narrowly construed, consistent with CEPA's remedial purpose. Young v. Schering Corp., 141 N.J. 16 (1995). To that end, "the waiver provision applies only to those causes of action that require a finding of retaliatory conduct that is actionable under CEPA." Id. at 29.

A-0352-19

As the Supreme Court recently observed, "[b]y pursuing a CEPA claim, a plaintiff waives any alternative remedy that would otherwise have been available for the same retaliatory conduct, although not at the expense of pursuing other causes of action that are substantially independent of the CEPA claim." Battaglia, 214 N.J. at 556 n. 9. Thus, for example, contract claims for severance pay or tort claims for defamation, which are based on different evidence from that supporting the CEPA claim and do not require a showing of reprisal, are not barred by the waiver provision. Young, 141 N.J. at 31.

In count six, plaintiff alleged that Foley wrongfully terminated her after she refused defendants' demands to violate state and federal laws and regulations, and then denied her the right to appeal the termination. Count six falls clearly within the scope of the waiver statute because it necessarily requires plaintiff to demonstrate that defendants engaged in a retaliatory fashion by firing her for refusing to violate state and federal laws.[7]

With respect to count seven, plaintiff's argument is grounded in defendants' failure to abide by the disciplinary procedures outlined in the handbook which she asserts was contractually obligated. Essentially, plaintiff

---

[7] We note that plaintiff's merits brief fails to address directly the court's conclusion that her wrongful termination claims in count six and seven are barred by N.J.S.A. 34:19-8.

claims that defendants' have made implied or express promises that she could be terminated only for cause and was entitled to the procedures under the Guidelines for Cooperation and Discipline and a review hearing under the Guaranteed Fair Treatment Policy, despite her position as an at-will employee.

Absent a contract, private employment is presumed to be at will, and generally an employee may be discharged with or without cause. Bernard v. IMI Sys., Inc., 131 N.J. 91, 104-06 (1993). However, an employee manual "may give rise to an implied contract of employment if its provisions 'contain an express or implied promise concerning the terms and conditions of employment.'" Witkowski v. Thomas J. Lipton, Inc., 136 N.J. 385, 393 (1994) (quoting Gilbert v. Durand Glass Mfg. Co., 258 N.J. Super. 320, 330 (App. Div. 1992)). In determining whether an employee manual creates an implied contract, the "key consideration . . . is the reasonable expectations of the employees." Id. at 392.

A disclaimer in an employment manual is only effective if, by its language and prominent placement, "no one could reasonably [believe the manual] was intended to create legally binding obligations." Nicosia v. Wakefern Food Corp., 136 N.J. 401, 412 (1994) (quoting Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 299 modified, 101 N.J. 10 (1985)). Such a disclaimer must "be

both clear and prominent so that the employee unmistakably understands that the manual provisions will not bind the company." Jackson v. Georgia-Pacific Corp., 296 N.J. Super. 1, 16 (App. Div. 1996) (internal quotation marks omitted). Further, a clearly-worded disclaimer serves "to provide adequate notice to an employee that she or he is employed only at will and is subject to termination without cause." Nicosia, 136 N.J. at 412. The "effectiveness of a disclaimer clause can be resolved by the court as a question of law." Id. at 416.

Here, in dismissing count seven, the court correctly concluded that plaintiff was an at-will employee and that the handbook made numerous disclaimers sufficient to rebut any implied or express promise that employment could only be terminated pursuant to the stepped procedures outlined within it. Indeed, the handbook included two disclaimers that provided "either [the employee] or Meridian can terminate their employment at any time, for any or no reason and with or without notice" and that nothing in the handbook would change plaintiffs at-will employment status. Further, Meridian reserved the right to "modify or revoke" the Guaranteed Fair Treatment Policy "or its implementation to a particular case in full or in part from time to time as it deems appropriate." Thus, the reasonable expectation of any employee reading

A-0352-19

defendants' disciplinary policy is that while stepped procedures may be used, plaintiff's employment remained at will.[8]

However, plaintiff's claim for compensation due and owing at the time of her termination as plead in count nine does not fall within the waiver statute because it is substantially independent from her CEPA claim. As noted, plaintiff maintained that she accumulated more than ninety-three hours of paid time off, more than 615 hours of sick leave, and that she was due an additional check as a "Special Team Member Award." She contends that defendants refused to pay her this earned compensation, despite her verbal and written demands.

As to this claim, plaintiff was only required to demonstrate that she had a right to the accrued time or earned a certain benefit and the amount, as opposed to demonstrating that defendants retaliated against her. See Young, 141 N.J. at 31 (holding that plaintiff's claim for severance due and owing under personnel policies was substantially unrelated to the retaliatory discharge claim). From the record before us, we cannot determine the actual amount of compensation

_____

[8] We also reject any claim by plaintiff that N.J.A.C. 8:43G-5.2(h) modifies plaintiff's at-will employment status. Indeed, N.J.A.C. 8:43G-5.2(h) merely provides that a "hospital shall develop and implement a grievance procedure for all staff. The procedure shall include, at least, a system for receiving grievances, a specified response time, assurance that grievances are referred appropriately for review, development of resolutions, and follow-up action."

that is owed to plaintiff, or if there exists a legal or factual basis for defendants' denial of this claim, and are satisfied that additional factual and legal determinations are necessary. R. 1:7-4. We accordingly reverse the dismissal of count nine and remand for further proceedings limited to plaintiffs right to any accrued compensation.

To the extent we have not addressed any of plaintiff's remaining arguments it is because we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part and reversed in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION